Thank you, Your Honor. I might at some point in time have heard of the charts that my associate Mr. Swick is putting out. Your Honor, we're here because in 2001 this Court issued a decision in the case of- admission in the Warner-Lambert case. He admits the process is trade secret. What in that is found in your patented process? The one disconnect I couldn't find in your argument is, what in the trade secret is admission applies to your patented process? Can you show me that? Yes, the use of sodium bicarbonate in a depronation reaction to cause the change of sodium- enaloprol malate to become complete or almost complete enaloprol sodium. So to change the enaloprol malate to enaloprol sodium in a reaction, in a wet granulation, that would be complete or almost complete. And Brenner refers to the process in his trial testimony on page 81616 of the Joint Proof 161. And on 161, which is your page 81617, he is asked, Dr. Brenner, when Merck made its decision to make its process for stabilizing Vasotec and the role of sodium bicarbonate in that process, as a trade secret, was it aware that its package insert was publicly available at that time? He says, yes, it was. The package insert contained the ingredients. So Merck was well aware that even knowing the ingredients, that would not give you what the process was. Then, when Brenner gets very specific... What process are we talking about, if I could just interrupt for a second? The Vasotec process or the patented process? The Vasotec process is what Brenner is talking about. The Vasotec tablet was accused of infringing the patent that the Vasotec tablet was, in fact, produced by the infringing process. Because the process made the enaloprole maliate in a wet granulation go to completion or almost complete. That, as Brenner says, in the Warner Does that include the limitation of the completeness? That is how Judge Canelli interpreted it in the district court decision. Can you point out where in the claim that... I can point it out in Judge Canelli's original district court decision. The claim, if I may, in the 780 patent, where the claim says, a process of the manufacture of a pharmaceutical solid composition comprising enaloprole sodium, which is the beginning sentence. That's the preamble. The preamble, but it's telling us what the process has to result in. It says, comprising enaloprole sodium, which process comprises the steps of, and then it talks about, after the mixing, we look down at B, about two-thirds of the way down. Thereby to achieve a reaction without converting the enaloprole maliate to a clear solution of enaloprole sodium. So you've got to create the pharmaceutically solid composition of enaloprole sodium by converting the enaloprole maliate in a reaction without turning it to a clear solution. I have the same question that Judge Rader had. Where does that show the aspect that you're relying on? Well, there's a couple of things. First of all, in the claim interpretation, when the judge looked at this, he determined that that meant that the reaction had to go to completion or almost completion. That claim construction has never been appealed. It was never challenged. So we have to assume at this point in the proceedings that that is what that claim means. It was never appealed by Merck. They never challenged that claim interpretation. So that means that that claim requires the reaction to go to completion or almost completion. That would be the rule of law in this case. Rader says, and I was pointing to his... But let's just say that that's not a given. Let's look at the claim. And this is the critical point, I think. Where in the claim is that which was preserved wrongfully as a trade secret? The reaction that causes the analacryl malate to become analacryl sodium, without it going into solution, in a wet granulation... But that's been disclosed. Say again? I'm sorry. That's not what you're relying on, is it? That is what was not disclosed. That reaction. It has to go to completion. And again, we go back to the claim interpretation that makes it completion. The court says, let's do it now. If this case had initially not been decided at summary judgment, and if it had gone to trial on the merits, then that would have been an issue to be decided whether that claim construction was correct. But that was never appealed. We have to assume that claim construction is correct. It wasn't appealed because it wasn't an issue? Oh, it wasn't an issue, because the question was, Merck said, we never suppressed our process for turning analacryl malate into analacryl sodium. Nowhere in any of the published documents did they ever tell anyone that they were changing analacryl malate into analacryl sodium. You need to help me again. Where is Brenner admitting that we kept the patented process as a trade secret? Everywhere else they said it was fully and completely and openly disclosed. I know they said it, but they never did. I think there's a disconnect between what Brenner is thinking is a trade secret and what you say is a patented process. That's what I'm suggesting. Well, the first thing I'd like to do is – and in the deposition, I directed Brenner to page 8, little d, of Brenner 10, the Supplemental Expert Report. And I have that page opened in front of me. It's page 19 – well, the page places a couple of places, but one of it is in 1907. And this is paragraph 6 of Brenner's Expert Report in the Warner-Lambert case. He says, I also testify that even after we discovered Merck that analacryl could be stabilized against civilization by in-situ depronination. And he uses the term depronination for the reaction that then changes analacryl malate into analacryl sodium. Because if you don't put in the right percentage of sodium bicarbonate, you're not going to get the conversion to analacryl sodium. That's the other thing. Just putting sodium bicarbonate in doesn't do it. You have to put the right amount in to cause that reaction to change it to analacryl sodium from analacryl malate. Now, which of your claims includes that?  Does it have a percentage? In the specification, it describes the percentage in the claim it says you make the conversion. I may also testify that even after we discovered at Merck that analacryl could be stabilized against civilization by in-situ depronination, there was a long and difficult period before we were able to consistently manufacture the analacryl formulation without stability problems. Through this process, we learned that numerous factors, including, for example, the type of mixing equipment, the duration and temperature of mixing, the holding time of the mixing equipment after mixing, and the particle size of sodium bicarbonate, moving on to A1908, all played an important role in the stabilization process. But you say the problem, but none of that is in your claim. We would suggest that by the claim covering the conversion in a wet granulation of analacryl malate to analacryl sodium, and having that conversion go substantially all the way or to be complete, whatever else they did to it besides the water, to get it to go to that is the trade secret, and that's what they did not show in Canada. Though they said they showed their process completely, they didn't. Mr. Breisblatt, you were under 60B, so this material that we're now discussing also has to have been something you could not have discovered at the time. Why didn't you just ask them at the time the precise dimensions of what they had disclosed and what they had kept a trade secret? Back in the original 102G inquiry. Two things, Your Honor, if I may. The first is we are here under 60B independent action. Not as the district court says, 60B3. We've never said it's a 60B3 action. I don't know where Judge Canelli got 60B3 from, but it shows up in about three or four places in his decision, and I think that guided his view and the grant in the Sermon on Judgment. The independent cause of action under the... So you're saying you didn't have to discover, you didn't have to make reasonable efforts to bring this dispute about what was disclosed in the original Apotex trial? You didn't have to bring that up during the Apotex trial? There was an inquiry, Major Honor, and that was interrogatory 17, and the response was we never suppressed or concealed it. So an inquiry was made. What is it? That's back to the whole point of this thing. What is the it? And did you specify what is it that they had to disclose? They were claiming that they had invented our process and they had under 102G disclosed it. The interrogatory said, what's your basis for your 102G defense? And they said, we've never suppressed or concealed the... The it. We've never suppressed or concealed the process because we showed it step by step in Canada. And the answer is they didn't show it step by step in Canada. They left out what we learned when Brenner testifies and Warner and Weber as being the key things. The other problem we have, and it really goes to the fraud on the court aspect, is this court... Why didn't you find that out at the time? I wasn't the attorney of the record at the time. Why didn't your client find it out at the time? I believe that they looked and did not and were never told that the critical parts, as Brenner says in the supplemental report, were these five elements. That those were needed to cause the reaction to go to completion or almost completion. I believe that it was Merck who knew about the trade secret. They were the ones who understood they were keeping it. It was a decision made at upper level management. Why didn't Merck's counsel say in their brief to this court, oh yeah, we suppressed and concealed it to 1986. Or in 1986 we made the decision to suppress and conceal it and keep it as a trade secret. That's what the Warner-Lambert panel in this court found. The Warner-Lambert panel in this court found in January of 1986 Merck began selling it as Vasotec. Merck's decision was whether to seek patent protection for its process or to maintain it as a trade secret. It appeared at this point that all of the ingredients of Vasotec were in the public domain. However, Merck concluded that competitors would not be able to figure out the process for making Vasotec from its ingredients alone. Namely, the process used to stabilize enalprol against syphilization. That's a process that converted from enalprol malate to enalprol sodium. Merck, therefore, chose to retain the sodium bicarbonate stabilization process as a trade secret in the forego patent protection. Juxtapose that determination by this court and Warner-Lambert at 418 Fed 1326 with this court's determination and the Apotex v. Merck decision at 254 Fed 1031. Our case law distinguishes between two types of suppression or concealment. The first is implicated in a situation in which an inventor actively suppresses or conceals his invention from the public. The second involves a legal inference of suppression or concealment based upon an unreasonable delay in filing a patent application. The later type is involved here. This court, on the one hand, says that there was no determination by an inventor to actively suppress or conceal his invention from the public. When you get Brenner's full testimony, this court determines something else. That Merck, in fact, did keep it as a trade secret, the same process. I think we've exhausted your time, Mr. Brice, but I'm afraid. Thank you, Your Honor. Thank you. Mr. Resnick, please. Yes, Your Honor. Good morning, Your Honor. What we're dealing with here, as Judge Rader remarked, is a 60-B action. What Apotex is bringing up is a number of facts that were available to it, not only available to it, but had actually discovered in the original case. Apotex had realized that they were not important to the determination the two courts arrived to in the original case. And now, having revised positions, trying to re-argue the same facts. A good example of this is when they opened with their appeal brief, they brought up the fact that they claimed there were these secret factors that Merck withheld in the disclosure in Canada. These secret facts, they claimed, were necessary to have the reaction occur sufficiently and to sufficient completion. We replied to that, and we showed at length in our written brief that they had actually questioned Dr. Brenner on this in detail about each of these factors. They came back in their reply brief, and what they tell us now is, well, what Merck hid was not the factors from a single case. What Merck hid was the fact that these factors were critical. And that's what they presented in their argument. That is still wrong. They deposed Dr. Brenner in November of 1999. And they asked in detail again about these factors and the fact that these factors were important in having the reaction occur during this wet granulation process. In fact, what they asked him was, they asked him about the 3 to 1 molar ratio of sodium bicarbonate to enalapur. And it's in the appendix in pages 2392 to 2393. He responded to them that the best reaction occurred when they had a 3 to 1 molar ratio. He talked about the role of hot water and the fact that the hot water was something that promoted the reaction. And that's in appendix page 2393. They addressed some memos that Merck had produced to them, their memoranda that Merck had produced to them, that there were a number of factors that were studied for the effect they would have on the reaction instead. That appears in the appendix in page 2398. And all of these are questions that Apotex's lawyers actually had asked Dr. Brenner. And Dr. Brenner responded to truthfully in completeness. The problem that Apotex is facing here is that none of these factors were relevant to the inquiry the court had undertaken in the original case with respect to validity under section 1 of 2G. This gets even further. They had questioned Dr. Brenner in the criticality of the particle size with respect to the reaction. And in the appendix on page 2400, in particular, they read him from a memorandum that Merck had produced to them. And they asked him, then you see Dr. Restain's statement. It says, it is imperative that particle sizes of both of these ingredients and the amount of water is extremely critical for the reaction to go to completion. And in turn, has a profound effect on the chemical stability and the depredate levels in the vasoduct tablets. And Dr. Brenner responded, from my own experience, I would concur that particle size was one of the elements. Not only in this case is there a case where the original courts reached the appropriate decision, because all of the aspects of the claimed invention were actually disclosed by Merck before the date of conception that Apotex had accepted. But in this case, they actually had all these additional facts that they're attempting to re-argue right now. And they were in their possession. And they decided not to bring them up, not to raise them. They didn't raise them because it really did not have an effect in their possession. This is further demonstrated by the fact, in this case, when they brought the 60B action, we asked them in an interrogatory. We asked them, were you able to obtain relevant discovery with respect to these alleged secret factors? This was interrogatory number six, and it's in the appendix in pages 24, 29, 24, 30. They refused to respond. They said they would not answer because it was irrelevant. Then we asked them in interrogatory number eight, explain all relevant discovery that you were unable to receive in Apotex I, in the original case. Again, they refused to respond. They said that that was irrelevant. The reason they refused to respond... Did the trade secret aspect come out during the initial Apotex proceeding? Absolutely. Where's that in the record? I'm sorry? Where's that in the record? In the appendix in page 17, 14, we produced to them a document. It's a 1986 memorandum by a gentleman called Brockett, where he actually discussed the possibility that they would retain the existence of sodium bicarbonate in the formulation as a trade secret. That was in Apotex's possession. Our position in the original case was that the process, that the claim, that the applicant's invention under 102G was no longer, by any concept, suppressed or concealed as of March 28, 1994. If you recall, in the original case, we were moving for summary judgment. In doing so, we wanted to remove any question of fact. To the extent there were questions of fact as to what may have been occurring before March 28, 1994, all our papers, and it's very clear, and I can go in painstaking detail through all our briefs, were all framed with our position as to what was the status of the applicant's invention after March 28, 1994. At the same time, it's important to recall that Dr. Sherman, the inventor for Apotex's patents, had conceded that there was no conception until two days after that. So, we established that it was actually, all the aspects of the fact of the claimed invention were available before the date of conception. Not only was that argued in fact, that's reflected in the original decision of this court. Apotex, and this is this court's opinion on page 1040, Apotex argues that these disclosures, and this is referring to the disclosures that Merck was relying upon, Inadequately described Merck's process of manufacturing invasive hectoplasts, and therefore that the public never received the benefit of the invention. They had all these facts. They knew exactly what was said in Canada, and what we were relying upon, as evidence that the process could not have been concealed at any time as of March 28, 1994. Now, it's also important to keep in mind that in the Warner-Lambert case that they claimed Dr. Brenner gave conflicting testimony, the critical date for the patent in that case was 1987. It was seven years before the date that was relevant in the inquiry that was undertaken in Apotex I. Now, with respect to the idea that this was actually perhaps actively suppressed or concealed, Apotex makes an argument that there is some difference, and what they didn't know is that perhaps this was actively suppressed or concealed versus an inference of suppression or concealment. Well, as the document in the appendix 1714 shows, they had every reason to investigate that, and they actually could have claimed that there was active suppression or concealment. In fact, they did, and that is also reflected in this Court's opinion in Apotex I. If we go to page 1040 again, the original opinion of this Court, it stated, Moreover, Apotex's argument that Merck suppressed or concealed the process by submitting misleading information to the FDA in 1983 is irrelevant because any suppression that was implicated was overcome by Merck's subsequent activity. We therefore conclude that the District Court did not err in granting summary judgment that the 780962 patents are invalid under 102G. Now, a key aspect seems to be the role of sodium bicarbonate in this. On page 1617, we were shown an admission, or apparent admission, that Mr. Brenner says that was kept as a trade secret. Where was that either disclosed at the time of Apotex I, or is that simply not part of the patent process? What's your argument on sodium bicarbonate? I think the role of sodium bicarbonate was absolutely disclosed in the Canadian case. And the way that was established was through admissions that Apotex's inventor made. Once again, that's reflected on the record, and it's again reflected in the Court's opinion, again on page 1040, where there are admissions that were made by the inventor where he accepted the fact that once the ingredients were known, in other words, that once in the granulation you would mix an alpha malate, which any chemist would know is an acid, and you mix sodium bicarbonate, which is a base, and you added water to that, you would have an acid-base reaction. So the fact that there's a reaction was disputed, and it in fact was very fiercely litigated in Apotex I. And I think in the end what carried the water was there were admissions by Dr. Sherman, there were admissions by other employees of Apotex, that once you have those facts in your possession, and they were in the public's possession after March of 1904, the fact that there's a reaction was disclosed. And there was no question about that. One of the things I wanted to bring the focus back on is that this is indeed a Rule 60B independent action, and what Apotex needs to show is a very high standard. The cases, in fact, in these types of actions, show that there has to be a very grave miscarriage of justice, and that the actions that can result in that are actually such a bribery, falsified documents, and undue influence. In this case, Apotex has not only failed to show any of this, it cannot even allege any of these, it has failed to show, I believe, any misconduct on the part of Merck. If anything, Merck made every discovery available to Apotex, every element of argument was available to Apotex, and it was made. The case was hotly disputed, and it was fairly litigated, and Apotex lost. Now what we have is a reaction of the old arguments, and they're coming back with new counsel, and trying to present us with the same arguments they did before, in essence. We can look at a couple of points. They tried to point out that we made misleading statements. Our statements were not misleading. Our statements reflected the evidence that was in the case, and in fact, they reflected what had occurred. Apotex litigated against that, and could not find any support for its positions. In fact, apart from admissions by their own inventor, that all of the aspects of the invention that were relevant had been disclosed by Merck before the March 1994 date. Apotex, again, also claims that Merck committed some misconduct. How do I know that this document on page 1714 was in the possession of Apotex during the first proceeding? This is the one that talks about keeping it as a trade secret. You told me that was clearly in Apotex's possession in the first proceeding. If I understood you correctly. Yeah, no, it was in their possession. In fact, it was produced directly. There's probably some way I can tell that from looking at it. Yeah, if you were to look on the production numbers, and that's impossible, but it is a production number from the original case, and it was in their possession. Where's the production number? It's the MCK-00-558. I got it. And I believe that... Your Honor, I'll stipulate. But they will not dispute that. One of thousands of documents provided by Apotex. Thank you. But Merck always took the position that with respect to summary judgment motion, it could not be disputed that the process was no longer concealed after the March 1994 date, when Merck had made the disclosure of how the ingredients were mixed. Now, I will touch very briefly on the reverse engineering argument, and again, this is an argument, and as the district court recognized, that Merck absolutely made based upon admissions that were made by Apotex's inventor. If Apotex had wanted to dispute the logic of our conclusions based on his admissions, they could have done so in the original case. And in fact, they tried to, and again, they lost. And again, as I mentioned a little while ago, we feel there's no conflict between this decision and the Warner-Lambert case, where the critical date that was in effect then was in 1987. Here, we're talking about events that occurred in 1994, seven years later. Simply put, we believe this is an attempt for a second bite at the apple by Apotex. Merck's conduct, if anything, was very open, providing all discovery that was requested of it, and perhaps beyond. And there is no reason to disturb the restrictive effect of the original case, if you have no questions. Thank you, Mr. Boussiris. Thank you, Your Honor. Mr. Harris, we've exhausted your rebuttal time. Yes, Your Honor. If I may, real quickly. I'd like to direct the Court to A. 1714, the document that Mr. Barzoukas points to as, in the thousands of documents, this was the one that alerted the free world that they were keeping it as a trade secret. I direct the Court to the first paragraph. All it says is that the term other ingredients was used in this case to cover the sodium bicarbonate as a trade secret. It doesn't mention the process at all. And sodium bicarbonate... Say again? You have denied that initially they kept it secret. Oh. Brenner talks about, and what we've argued is, it was the process, which is in the patent, that they kept as a trade secret. Brenner says we kept it as a trade secret, the process, not the ingredient, because they knew, as this Court found in the Warner-Lambert case, that the ingredients were out there in the public. Sodium bicarbonate, good deal. But it was its use in the process, because sodium bicarbonate is used with just pH normally in these formulations. Here it was used for the specific purpose of a depronation reaction, as Brenner sets out, and that was a trade secret. And that's what's covered in the patent, the use of sodium bicarbonate to convert an alkyl amylate. And I do want to point out one other thing. Murray, the attorney for Merck, who's on every one of the pleadings, was well aware that the Canadian process left out key aspects. And I asked him about it in his deposition. So where it says with the assistance of... I don't think your time is exhausted. All right, well, the Court may look at that. And they admitted they left that out.  Thank you.